1
2
3
4
5
6
7
8
9
10

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| M.R.R., | Case No. 1:25-CV-01517-JLT-SKO |
| Petitioner, | ORDER CONVERTING THE MATTER TO A PRELIMINARY INJUNCTION[1] AND GRANTING THE PRELIMINARY INJUNCTION IN PART AND REFERRING THE MATTER TO THE ASSIGNED MAGISTRATE JUDGE AND DENYING RESPONDENTS' MOTION TO STRIKE |
| v. | |
| CHRISTOPHER CHESTNUT et al., | |
| Respondents. | |
| | (Docs. 2, 15) |

## I.    INTRODUCTION

Before the Court for decision is M.R.R.'s ("Petitioner's") request for a temporary restraining order, (Doc. 2), filed in conjunction with her petition for a writ of habeas corpus brought under 28 U.S.C. § 2241 challenging her ongoing immigration detention (Doc. 1), and Respondents' Motion to Strike (Doc. 15.) Having evaluated the TRO request, Respondents' opposition, (Doc. 11), Petitioner's reply, (Doc. 13), and Respondents' supplemental filing alongside the entire record, the Court converts the matter into a motion for preliminary injunction, **GRANTS** that motion **IN PART**, and **REFERS** the matter to the assigned magistrate judge for a determination on the merits. Furthermore, the Court **DENIES** Respondents' Motion

---

[1] Upon agreement of the parties, the Court converts the motion for temporary restraining order into one for preliminary injunction. (Doc. 11 at 1, fn. 1; Doc. 13 at 7.) The parties have also affirmatively declined an evidentiary hearing. (*Id.*)

1  to Strike.[2]

2  ## II.    FACTUAL & PROCEDURAL BACKGROUND

3       Petitioner is a citizen and national of Peru who entered the United States on or about

4  November 7, 2022, at which time she and her two granddaughters were apprehended by the

5  Department of Homeland Security near Calexico, California. (Doc. 1-2, ¶9-10; Doc. 11-1 ¶6.)

6  Petitioner admitted to entering the United States unlawfully. (Doc. 11-1 at 6.) That same day,

7  Petitioner was released on an Order of Recognizance "due to a lack of bed space" (*Id*. at 6, 10)

8  and served with an I-220A Notice of Appear (Doc. 1-3; Doc. 11-1 at 12)) pursuant to INA

9  212(a)(6)(A)(i) (8 U.S.C. §1182(a)(6)(A)(i)) as a noncitizen not admitted or paroled in the

10  United States. In doing so, immigration officials necessarily determined that Petitioner did not

11  present a risk of flight or danger to the community. *See* 8 C.F.R. § 1236.1(c)(8) ("Any officer

12  authorized to issue a warrant of arrest may, in the officer's discretion, release an alien not

13  described in section 236(c)(1) of the Act, under the conditions at section 236(a)(2) and (3) of the

14  Act; provided that the alien must demonstrate to the satisfaction of the officer that such release

15  would not pose a danger to property or persons, and that the alien is likely to appear for any

16  future proceeding."). The I-220A form Petitioner signed upon her release imposed various

17  conditions, including reporting to a duty officer in Stockton, California on November 22, 2022.

18  (Doc. 11-1 at 10.)

19       Later, DHS enrolled Petitioner into the Intensive Supervision Alternative Program

20  ("ISAP") (Doc. 11-1, ¶8.) Petitioner contends that she attended all court hearings and complied

21  with all ISAP reporting requirements, including wearing an ankle monitor for a month. (Doc 1-2,

22  _____

23  [2] Respondents' motion to strike was addressed to material in Petitioner's counsel's declarations that is not dispositive of the outcome of the instant motion for preliminary injunction. *See e.g.,* Doc. 2-3 at 4 ("Since her arrival in in November 2022, M.M.R. complied with every directive provided by ICE and her check-ins."); Doc. 13-1 at 2

24  ("M.M.R. does not recall failing to complete some of her SmartLINK phone photo surveillance check-ins. To the best of her ability and recollection, she properly checked-in each time."). To the extent Respondents argue that

25  certain facts in the declarations are hearsay, because the procedures governing a preliminary injunction are generally less formal than those at trial, the Court may rely upon otherwise inadmissible evidence when considering a

26  preliminary injunction. *See Med-Cert Home Care, LLC v. Azar*, 365 F. Supp. 3d 742 (N.D. Tex. 2019). The admissibility of hearsay under the Federal Rules of Evidence goes to weight, not preclusion, at the preliminary

27  injunction stage. To hold otherwise would be at odds with the summary nature of the remedy and would undermine the ability of courts to provide timely provisional relief. *See Mullins v. City of New York*, 626 F.3d 47, 52 (2d Cir.

28  2010) (holding that the district court committed no error in considering, and relying on, hearsay testimony at the preliminary injunction stage).

¶12.)  At some point, Petitioner was instructed to complete periodic photo check-ins as part of her reporting requirements, and sent a completed a photo check-in just days prior to her arrest. (*Id.*at ¶13.) Respondents describe Petitioner's ISAP compliance differently, asserting that she missed required self-report check-ins on October 22, 2024, January 14, 2025, February 11, 2025, March 13, 2025, and July 29, 2025. (Doc 11-1, ¶9.) Respondents also report that Petitioner was previously reminded to comply with the conditions of release but continued to violate ISAP reporting requirements. (Doc. 11-1 at 7.)

According to information relayed to the Court from Petitioner through counsel, she came to live in Tracy, California after entering United States, where she lives with her three adult children and her granddaughters. (Doc. 1-2, ¶11.) She has kept a clean criminal record and supports her family through childcare and household chores. (*Id.*) Petitioner timely filed a Form I-589 (Application for Asylum and Withholding of Removal) and has a master hearing calendared in 2027 prior to her detention. (*Id.,* ¶20.) She now has a scheduled hearing date of November 19, 2025. (*Id.*)

On or about October 25, 2025, Petitioner reported to the Immigration and Customs Enforcement Field Office in Stockton for a scheduled office visit, where she was arrested for violating the conditions of the ISAP program. (Doc. 1-2, ¶15; Doc 11-1, ¶10). Later that evening, Petitioner was transferred from Stockton to the California City Correctional Facility. (Doc. 1-2, ¶18.)

On November 8, 2025, Petitioner filed a petition for writ of habeas corpus (Doc. 1) asserting that her detention is unlawful under the Immigration Nationality Act and violates her procedural and substantive due process rights under the Fifth Amendment. (Doc. 2.) She also filed a motion for a temporary restraining order requesting immediate release and other injunctive relief (*Id*) and a motion to proceed via pseudonym (Doc. 3.) At the time of filing, Petitioner's next scheduled immigration hearing was set for November 19, 2025. (Doc. 1-2 at ¶20.)

The government opposes the issuance of preliminary injunctive relief and maintains that Petitioner's detention is "mandatory" under expedited removal procedures set forth at 8 U.S.C. §

3

1   1225(b)(2). (*See generally* Doc. 11.) In support of their arguments, Respondents offer the

2   Declaration of Deportation Officer Chavez, who details how Petitioner "did not comply with her

3   ISAP reporting requirements and missed her check-ins on numerous occasions, including

4   October 22, 2024, January 14, 2025, February 11, 2025, March 13, 2025, and July 19, 2025.

5   (Doc 11-1; ¶20.) Respondents attached an I-213 Form (Doc. 11-1 at 7), which listed Petitioner's

6   ISAP violation and the types of violations that occurred on each of the asserted violation dates,

7   but did not include any backup documentation regarding the ISAP violations or other evidence

8   of warnings given to Petitioner. Due to the ambiguity in the declaration, the Court required

9   Respondents to file the underlying documents upon which the declaration relied. The order

10  reads:

11          Respondents have presented the declaration of a Deportation
            Officer attesting that Petitioner incurred numerous ISAP violations
12          and generally describing the nature of those violations. (Doc. 11 -
            1.) However, to evaluate any appropriate relief in this case, the
13          Court requires additional detail from Respondents. Thus, on or
            before noon on November 18, 2025, Respondents are directed to
14          supplement the record with backup documentation demonstrating
            the type(s) of violation(s) that occurred on each of the asserted
15          violation dates.

16  (Doc. 12.) On November 18, 2025, Respondents provided an additional declaration from DO

17  Juarez (Doc. 14) and ISAP records documenting Petitioner's various violations. (Doc. 14-1 at 1.)

18  Even still, Respondents did not provide any evidence of contemporaneous notices or warning

19  letters of the relevant violations. Petitioner argues in her reply (Doc. 13) that she "does not recall

20  failing to complete some of her SmartLINK phone photo surveillance check-ins. To the best of

21  her ability and recollection, she has properly checked-in each time." (Doc. 13 at 4.) Petitioner

22  also that she "struggles with digital literacy and has relied on her family for support during her

23  check-ins." (*Id.*)

## III.    LEGAL BACKGROUND

### A.    Statutory Immigration Framework (8 U.S.C. § 1225 and § 1226)

26          Two statutes govern the detention and removal of inadmissible noncitizens from the

27  United States: 8 U.S.C. § 1226 and § 1225. In the interest of expedience, the Court relies here, as

28  relevant, on the legal background accurately presented by the district court in *Salcedo Aceros v.*

*Kaiser*, No. 25-CV-06924-EMC, 2025 WL 2637503 (N.D. Cal. Sept 12, 2025):

### A. Full Removal Proceedings and Discretionary Detention (§ 1226)

The "usual removal process" involves an evidentiary hearing before an immigration judge. *Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 108 (2020). Proceedings are initiated under 8 U.S.C. § 1229(a), also known as "full removal," by filing a Notice to Appear with the Immigration Court. *Matter of E-R-M- & L-R-M-*, 25 I. & N. Dec. 520, 520 (BIA 2011). Section § 1226 provides that while removal proceedings are pending, a noncitizen "may be arrested and detained" and that the government "may release the alien on ... conditional parole." § 1226(a)(2); *accord Thuraissigiam*, 591 U.S. at 108 (during removal proceedings, applicant may either be "detained" or "allowed to reside in this country"). When a person is apprehended under § 1226(a), an ICE officer makes the initial custody determination. *Diaz v. Garland*, 53 F.4th 1189, 1196 (9th Cir. 2022) (citing 8 C.F.R. § 236.1(c)(8)). A noncitizen will be released if he or she "demonstrate[s] to the satisfaction of the officer that such release would not pose a danger to property or persons, and that the alien is likely to appear for any future proceeding." *Id.* (citing 8 C.F.R. § 236.1(c)(8)).

"Federal regulations provide that aliens detained under § 1226(a) receive bond hearings at the outset of detention." *Jennings v. Rodriguez*, 583 U.S. 281, 306 (2018) (citing 8 CFR §§ 236.1(d)(1)). If, at this hearing, the detainee demonstrates by the preponderance of the evidence that he or she is not "a threat to national security, a danger to the community at large, likely to abscond, or otherwise a poor bail risk," the IJ will order her or her release. *Diaz*, 53 F.4th at 1197 (citing *Matter of Guerra*, 24 I. & N. Dec. 37, 40 (B.I.A. 2006)). Once released, the noncitizen's bond is subject to revocation. Under 8 U.S.C. § 1226(b), "the DHS has authority to revoke a noncitizen's bond or parole 'at any time,' even if that individual has previously been released." *Ortega v. Bonnar*, 415 F. Supp. 3d 963, 968 (N.D. Cal. 2019). However, if an immigration judge has determined the noncitizen should be released, the DHS may not re-arrest that noncitizen absent a change in circumstance. *See Panosyan v. Mayorkas*, 854 F. App'x 787, 788 (9th Cir. 2021). Where the release decision was made by a DHS officer, not an immigration judge, the Government's practice has been to require a showing of changed circumstances before re-arrest. *See Saravia v. Sessions*, 280 F. Supp. 3d 1168, 1197 (N.D. Cal. 2017).

### B. Expedited Removal and Mandatory Detention (§ 1225)

While "§ 1226 applies to aliens already present in the United States," U.S. immigration law also "authorizes the Government to detain certain aliens seeking admission into the country under §§ 1225(b)(1) and (b)(2)," a process that provides for expedited removal. *Jennings*, 583 U.S. at 303 (2018). Under § 1225, a noncitizen "who has not been admitted or who arrives in the United States" is considered "an applicant for admission." 8 U.S.C. § 1225(a)(1). For certain applicants for admission, 8 U.S.C. § 1225

authorizes "expedited removal." § 1225(b)(1). § 1225(b)(1) provides that:

> "If an immigration officer determines that an alien (other than an alien described in subparagraph (F)) who is arriving in the United States or is described in clause (iii) is inadmissible under section 212(a)(6)(C) or 212(a)(7) [8 U.S.C. § 1182(a)(6)(C) or 1182(a)(7)], the officer shall order the alien removed from the United States without further hearing or review unless the alien indicates either an intention to apply for asylum under section 208 [8 USCS § 1158] or a fear of persecution."

Sections 8 U.S.C. § 1182(a)(6)(C) and 1182(a)(7) respectively refer to noncitizens who are inadmissible due to misrepresentation or failure to meet document requirements. Clause (iii) of § 1225(b)(1) allows the Attorney General (who has since delegated the responsibility to the Department of Homeland Security Secretary) to designate for expedited removal noncitizens "who ha[ve] not been admitted or paroled into the United States, and who ha[ve] not affirmatively shown, to the satisfaction of an immigration officer, that the alien has been physically present in the United States continuously for the 2-year period immediately prior to the date of the determination of inadmissibility under this subparagraph." § 1225(b)(1)(A)(iii)(II).

To summarize, under § 1225(b)(1), two groups of noncitizens are subject to expedited removal. First, there are "arriving" noncitizens who are inadmissible due to misrepresentation or failure to meet document requirements. The implementing agency regulations define "arriving alien" as applicants for admission "coming or attempting to come into the United States at a port-of-entry." 8 C.F.R. § 1.2. The second group –designated noncitizens –includes noncitizens who meet all of the following criteria: (1) they are inadmissible due to lack of a valid entry document or misrepresentation; (2) they have not "been physically present in the United States continuously for the 2-year period immediately prior to the date of the determination of inadmissibility"; and (3) they are among those whom the Secretary of Homeland Security has designated for expedited removal. *Thuraissigiam*, 591 U.S. at 109; § 1225(b)(1).

"Initially, DHS's predecessor agency did not make any designation [under (3)], thereby limiting expedited removal only to 'arriving aliens,'" that is, noncitizens encountered at ports of entry. *Make the Rd. N.Y. v. Noem*, No. 25-cv-190 (JMC), 2025 U.S. Dist. LEXIS 169432, at *14 (D.D.C. Aug. 29, 2025). In the following years, DHS extended by designation expedited removal to noncitizens who arrive by sea and who have been present for fewer than two years, and to noncitizens apprehended within 100 air miles of any U.S. international land border who entered within the last 14 days. *Id.* This was the status quo until January 2025, when the Department of Homeland Security revised its § 1225 designation to "apply expedited removal to the fullest extent authorized by statute."

Designating Aliens for Expedited Removal, 90 Fed. Reg. 8139 (Jan. 24, 2025). Under this designation, expedited removal applies to noncitizens encountered *anywhere* within the United States, who have been in the United States for less than two years and are inadmissible for lack of valid documentation or misrepresentation. In short, expedited removal was expanded to apply for the first time to vast numbers of noncitizens present in the interior of the United States.

Under the expedited removal statute § 1225(b)(1), if an applicant "indicates either an intention to apply for asylum" or "a fear of persecution," the immigration officer "shall refer the alien for an interview by an asylum officer." §§ 1225(b)(1)(A)(i)–(ii). If the asylum officer determines that the applicant has a "credible fear," the applicant "receive[s] 'full consideration' of her asylum claim in a standard removal hearing." *Thuraissigiam*, 591 U.S. at 110. If the officer determines there is no "credible fear," the officer "shall order the alien removed from the United States without further hearing or review." § 1225(b)(1)(B)(iii). However, the officer's decision may be appealed by the applicant to an immigration judge, who must conduct the review "to the maximum extent practicable within 24 hours, but in no case later than 7 days after the date of the determination." *Id.* Detention under § 1225(b)(1) is "mandatory" "pending a final determination of credible fear of persecution and if found not to have such a fear, until removed." *Id.* (citing § 1225(b)(1)(B)(iii)(IV) ("Any alien subject to the procedures under this clause shall be detained pending a final determination of credible fear of persecution and, if found not to have such a fear, until removed.")

[Section] 1225 also contains a provision that applies to applicants for admission not covered by § 1225(b)(1). *Jennings*, 583 U.S. at 287. This provision, 1225(b)(2), states that, subject to statutory exceptions, "in the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a [full removal proceedings] of this title." § 1225(b)(2). In other words, noncitizens subject to 1225(b)(2) are not eligible for expedited removal but are subject to mandatory detention while their full removal proceedings are pending. This is in contrast to the default detention regime under § 1226(a), which allows for discretionary release and review of detention through a bond hearing.

## C. The Government's Recent Change in Position

Until this year, the DHS has applied § 1226(a) and its discretionary release and review of detention to the vast majority of noncitizens allegedly in this country without valid documentation. This practice was codified by regulation. The regulations implementing the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA") state that "Despite being applicants for admission, aliens who are present without having been admitted or paroled (formerly referred to as aliens who entered without inspection) will

be eligible for bond and bond redetermination." 62 Fed. Reg. 10312, 10323 (Mar. 6, 1997). In fact, the government has conceded in other contexts that "DHS's long-standing interpretation has been that 1226(a) [discretionary detention] applies to those who have crossed the border between ports of entry and are shortly thereafter apprehended." Dkt. No. 17 (citing Solicitor General, Transcript of Oral Argument at 44:24–45:2, *Biden v. Texas*, 597 U.S. 785 (2022) (No. 21-954)) . . .

In 2025, however, the Government's policy changed dramatically. The DHS revised its § 1225 designation to "apply expedited removal *to the fullest extent authorized by statute.*" Designating Aliens for Expedited Removal, 90 Fed. Reg. 8139 (Jan. 24, 2025) (emphasis added). The Secretary of Homeland Security memorandum directed federal immigration officers to "consider ... whether to apply expedited removal" to "any alien DHS is aware of who is amenable to expedited removal but to whom expedited removal has not been applied." Dkt. No. 1 at ¶ 33. Officers are encouraged to "take steps to terminate any ongoing removal proceeding and/or any active parole status." *Id.* The memorandum states that DHS shall take the actions contemplated by the memorandum "in a manner that takes account of legitimate reliance interests," but states that "the expedited removal process includes asylum screening, which is sufficient to protect the reliance interests of any alien who has applied for asylum or planned to do so in a timely manner." Huffman Memorandum (Jan. 23, 2025).

Since mid-May of 2025, the Department of Homeland Security has made a practice of appearing at regular removal proceedings in immigration court, moving to dismiss the proceedings, and then re-arresting the individual in order to place them in expedited removal proceedings. Dkt. No. 1 at ¶¶ 35–40. If the immigration judge does not dismiss the full removal proceedings, ICE still makes an arrest, apparently in reliance on § 1225(b)(2)'s detention provision.

*Salcedo Aceros*, 2025 WL 2637503 at *1-4 (internal footnotes omitted).

## B.    Parole Revocation

In *Y-Z-H-L v. Bostock*, 2025 WL 1898025, at *10–12 (D. Or. July 9, 2025), the court

explained the parole process in immigration cases and noted that before parole may be revoked,

the parolee must be given written notice of the impending revocation, which must include a

cogent description of the reasons supporting the revocation decision. The court held:

Section 1182 . . . has a subsection titled "Temporary admission of nonimmigrants," which allows noncitizens, even those in required detention, to be "paroled" into the United States. This provision, at issue in this case, states:

The Secretary of Homeland Security may, except as provided in subparagraph (B) or in section 1184(f) of

8

1    this title, in her discretion parole into the United States
2    temporarily under such conditions asShe may prescribe
only on a case-by-case basis for urgent humanitarian
reasons or significant public benefit any alien applying
3    for admission to the United States, but such parole of
such alien shall not be regarded as an admission of the
4    alien and **when the purposes of such parole shall, in
the opinion of the Secretary of Homeland Security,**
5    **have been served the alien shall forthwith return or
be returned to the custody from whichShe was**
6    **paroled and thereafter her case shall continue to be
dealt with in the same manner as that of any other**
7    **applicant for admission to the United States.**

8    8 U.S.C. § 1182(d)(5)(A).

9    *Y-Z-H-L v. Bostock*, 2025 WL 1898025, at *3 (emphasis added). *Y-Z-H-L* determined that under

10    the Administrative Procedure Act, immigration parolees are entitled to determinations related to

11    their parole revocations that are not arbitrary, capricious or an abuse of discretion. *Id*. at *10. An

12    agency acts arbitrarily and capriciously by failing to make a reasoned determination or where the

13    agency fails to "articulate[] a satisfactory explanation for its action including a rational

14    connection between the facts found and the choice made." *Id*. Parole revocations in the context

15    of the INA must occur on a case-by-case basis and may occur "when the purposes of such parole

16    shall, in the opinion of the Secretary of Homeland Security, have been served the alien shall

17    forthwith return or be returned to the custody from which he was paroled." *Id*. at *12 (quoting 8

18    C.F.R. § 212.5(e)). 8 C.F.R. § 212.5(e) requires written notice of the termination of parole

19    except where the immigrant has departed or when the specified period of parole has expired.

20    Applying *Y-Z-H-L* and § 212.5(e), *Mata Velasquez v. Kurzdorfer*, No. 25-CV-493-LJV,

21    2025 WL 1953796, at *11 (W.D.N.Y. July 16, 2025), found that the INA requires a case-by-case

22    analysis as to the decision to revoke humanitarian parole:

23    This Court agrees that both common sense and the words of the
24    statute require parole revocation to be analyzed on a case-by-case
basis and that a decision to revoke parole "must attend to the reasons
an individual [noncitizen] received parole." *See id*. There is no
25    indication in the record that the government conducted any such
analysis here. On the contrary, the letter Mata Velasquez received
26    merely stated summarily that DHS had "revoked [his] parole."
Docket Item 62-1 at 5. Thus, there is no indication that—as required
27    by the statute and regulations—an official with authority made a
determination specific to Mata Velasquez that either "the purpose
28    for which [his] parole was authorized" has been "accomplish[ed]"

or that "neither humanitarian reasons nor public benefit warrants [his] continued presence...in the United States." *See* 8 C.F.R. § 212.5(e)(2)(i). As a result, DHS's revocation of Mata Velasquez's parole violated her rights under the statute and regulations. *See Y-Z-L-H*, 2025 WL 1898025, at *13.

In *Pinchi v. Noem*, No. 5:25-CV-05632-PCP, ___ F. Supp. 3d ___, 2025 WL 2084921, at *3 (N.D. Cal. July 24, 2025), the court reached a similar conclusion relying on the Due Process Clause:

> . . . **even when ICE has the initial discretion to detain or release a noncitizen pending removal proceedings, after that individual is released from custody she has a protected liberty interest in remaining out of custody**. *See Romero v. Kaiser*, No. 22-cv-02508, 2022 WL 1443250, at *2 (N.D. Cal. May 6, 2022) ("[T]his Court joins other courts of this district facing facts similar to the present case and finds Petitioner raised serious questions going to the merits of her claim that due process requires a hearing before an IJ prior to re-detention."); *Jorge M. F. v. Wilkinson*, No. 21-cv-01434, 2021 WL 783561, at *2 (N.D. Cal. Mar. 1, 2021); *Ortiz Vargas v. Jennings*, No. 20-cv-5785, 2020 WL 5074312, at *3 (N.D. Cal. Aug. 23, 2020); *Ortega*, 415 F. Supp. 3d at 969 ("Just as people on preparole, parole, and probation status have a liberty interest, so too does [a noncitizen released from immigration detention] have a liberty interest in remaining out of custody on bond.").

*Id.* (emphasis added). Other courts, including this Court, have held similarly. *Doe v. Becerra*, No. 2:25-CV-00647-DJC-DMC, 2025 WL 691664, at *4 (E.D. Cal. Mar. 3, 2025); *see also Padilla v. U.S. Immigr. & Customs Enf't*, 704 F. Supp. 3d 1163, 1172 (W.D. Wash. 2023) ("The Supreme Court has consistently held that non-punitive detention violates the Constitution unless it is strictly limited, and, typically, accompanied by a prompt individualized hearing before a neutral decisionmaker to ensure that the imprisonment serves the government's legitimate goals.").

## IV.    ANALYSIS

### A.    Jurisdiction

#### 1.    Habeas Corpus

Under 28 U.S.C. § 2241, the Court has the authority to determine a petition for writ of habeas corpus in which the petitioner asserts she is being held in custody "in violation of the Constitution or laws or treaties of the United States." "The essence of habeas corpus is an attack by a person in custody upon the legality of that custody, and that the traditional function of the writ is to secure release from illegal custody." *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973).

1   Petitioner seeks her immediate release from custody, which she contends violates the

2   Constitution of the United States. (*See* Doc. 1.) Thus, she properly invokes the Court's habeas

3   jurisdiction.

4           2.      Judicial Review under the INA

5           The INA limits judicial review in many instances. Though 8 U.S.C § 1252(g) precludes

6   this Court from exercising jurisdiction over the executive's decision to "commence proceedings,

7   adjudicate cases, or execute removal orders against any alien," there is no removal order at issue

8   here and the central issue is Petitioner's continued detention. Thus, this Court has the authority

9   to review the termination of Petitioner's release. *See Jennings v. Rodriguez*, 583 U.S. 281, 294

10  (2018) (holding that § 1252(g) precludes judicial review only as to the three areas specifically

11  outlined in the subsection); *see also Reno v. American–Arab Anti–Discrimination Comm.*, 525

12  U.S. 471, 482 (1999).

13  **B.      Preliminary Injunction**

14          The standard for issuing a TRO is the same as the standard for issuing a preliminary

15  injunction. *See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co*., 240 F.3d 832, 839 n. 7 (9th

16  Cir. 2001) (explaining that the analysis for temporary restraining orders and preliminary

17  injunctions is "substantially identical"). When seeking a TRO or PI, plaintiffs must establish: (1)

18  they are "likely to succeed on the merits" of their claims, (2) they are "likely to suffer irreparable

19  harm in the absence of a preliminary injunction," (3) "the balance of equities tips in [their]

20  favor" and (4) "an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555

21  U.S. 7, 20 (2008). The moving party has the burden to "make a showing on all four prongs" of

22  the *Winter* test to obtain a preliminary injunction. *Alliance for the Wild Rockies v. Cottrell*, 632

23  F.3d 1127, 1135 (9th Cir. 2011). Thus, the moving party has "the burden of persuasion."

24  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997); *Hecox v. Little*, 104 F.4th 1061, 1073 (9th Cir.

25  2023). The Court may weigh the request for a preliminary injunction with a sliding-scale

26  approach. *Alliance*, at 1135 (9th Cir. 2011). Accordingly, a stronger showing on the balance of

27  hardships may support the issuance of a preliminary injunction where there are "serious

28  questions on the merits … so long as the plaintiff also shows that there is a likelihood of

1   irreparable injury and that the injunction is in the public interest." *Id.* "A preliminary injunction

2   is an extraordinary remedy never awarded as of right." *Winter*, 555 U.S. at 24. Preliminary

3   injunctions are intended to "merely to preserve the relative positions of the parties until a trial on

4   the merits can be held, and to balance the equities at the litigation moves forward." *Lackey v.*

5   *Stinnie*, 604 U.S. ___, 145 S. Ct. 659, 667 (2025) (citations omitted).

6       The status quo refers to "the last uncontested status which preceded the pending

7   controversy." *Tanner Motor Livery, Ltd. v. Avis, Inc*., 316 F.2d 804, 809 (9th Cir. 1963) (quoting

8   *Westinghouse Elec. Corp. v. Free Sewing Mach. Co*., 256 F.2d 806, 808 (7th Cir. 1958)). In the

9   Court's view, that is the status before Petitioner was arrested. *See Kuzmenko v. Phillips,* No. 25-

10  CV-00663, 2025 WL 779743, at *3 (E.D. Cal. Mar. 10, 2025) (granting a temporary restraining

11  order requiring immediate release of the petitioner back to home confinement from custody, as a

12  restoration of the status quo).

13      Even if the Court's action here constitutes a mandatory injunction,[3] the evidence supports

14  that action Petitioner alleges she has suffered and is suffering violations of her substantive and

15  procedural due process rights and that her continued unlawful detention will impose on him

16  serious injury if the injunction is not issued. The injunction issued here is on firm legal footing

17  and the result does not appear to be doubtful either; due process clearly requires that Petitioner

18  be given a hearing before her bond is revoked. These injuries are not capable of redress through

19  monetary compensation. Accordingly, injunctive relief is appropriate even under the higher

20  standard for mandatory injunctions.

21      1.   <u>Likelihood of Success on the Merits</u>

22      This first factor "is the most important" under *Winter*, and "is especially important when

23  a plaintiff alleges a constitutional violation and injury." *Baird v. Bonta*, 81 F.4th 1036, 1041 (9th

---

25  [3] "A prohibitory injunction prohibits a party from taking action and preserves the status quo pending a determination

26  of the action on the merits." *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co*., 571 F.3d 873, 879 (9th
    Cir. 2009) (internal citations omitted). In other words, a prohibitory injunction "freezes the positions of the parties
    until the court can hear the case on the merits." *Heckler v. Lopez*, 463 U.S. 1328, 1333 (1983). A mandatory

27  injunction, on the other hand, "orders a responsible party to 'take action.'" *Marlyn Nutraceuticals*, 571 F.3d at 879
    (quoting *Meghrig v. KFC W., Inc*., 516 U.S. 479, 484 (1996)). Although subject to a higher standard, a mandatory

28  injunction is permissible when "extreme or very serious damage will result" that is "not capable of compensation in
    damages," and the merits of the case are not "doubtful." *Id.* (internal citations and quotation marks omitted).

1  Cir. 2023). Petitioner contends that her re-detention and continued detainment violates both

2  substantive and procedural due process. (*See generally* Doc. 2 at 12-17.)

3            a.     *Respondents Rely on an Incorrect Interpretation of § 1225 for the*

4                   *Authority to Detain Respondent*

5            Respondents maintain Petitioner's detention is "mandatory" under 1225(b) while her

6  removal proceedings are pending. (Doc. 10 at 6–10.)[4] The various legal arguments relied upon

7  by DHS to support this assertion have been rejected by this Court in other proceedings. *See, e.g.*,

8  *Ortiz Donis v. Chestnut,* 1:25-CV-01228-JLT, 2025 WL 2879514 at *3–6 (E.D. Cal. Oct. 9,

9  2025).

10           The Court acknowledges that a recent decision in this district accepted Respondents' new

11 interpretation of § 1225(b)(2), finding that an individual who had been living in the United

12 States for nearly 30 years remained a noncitizen, "applicant for admission" under § 1225(b)(2)

13 and therefore subject to mandatory detention without a pre-deprivation hearing. *Valencia v.*

14 *Chestnut*, --- F. Supp. 3d ---, 2025 WL 3205133 (E.D. Cal. Nov. 17, 2025). However, unlike

15 M.M.R, the petitioner in *Valencia* had <u>never</u> been encountered, let alone processed, by

16 immigration officials, and had not been placed in Section 240 proceedings. (*See Valencia v.*

17 *Chestnut*, Case No. 1:25-cv-01550-WBS-JDP, Doc. 8 at 2.) Even assuming, *arguendo*, that

18 Respondents' new interpretation of § 1225(b)(2) is the better textual reading of the applicable

19 statutes and thus may be applied to applicants for admission going forward, Respondents argue

20 _____

21 [4] Respondents rely on the doctrine of "entry fiction" to argue that Petitioner is an inadmissible noncitizen who
   should be treated as if she has not entered the country and generally has no right to procedural due process. (Doc. 11
22 at 4.) "Entry fiction" is a concept in immigration law that deems noncitizens physically within the United States, but
   not legally admitted, to be outside the United States for some legal purposes. *See Lin Guo Xi v. INS*, 298 F.3d 832,
23 837 (9th Cir. 2002). In support, the government cites *Barrea-Echavarria v. Rison*, 44 F.3d 1441, 1450 (9th Cir.
   1995)(en banc) and *Dep't of Homeland Sec. v. Thuraissigiam*, 140 S. Ct. 1959 (2020) for the proposition that "if an
24 alien seeking admission is physically present on U.S. soil and has been 'paroled elsewhere in the country for years
   pending removal,' he is still 'treated…as if stopped at the border' for immigration purposes." (Doc. 11 at 5)
25 (quoting *Thuraissigiam*, 591 U.S. at 139).  The Court finds these cases inapposite and rejects Respondents'
   argument that "entry fiction" cases guide the analysis for cases not involving an expedited removal process. The
26 court in *Immigrant Defs. L. Ctr. v. Mayorkas*, No. CV209893JGBSHKX, 2023 WL 3149243 (C.D. Cal. Mar. 15,
   2023) similarly found that the "entry fiction" body of case law "did not address the regular removal process that
27 people like [Petitioner] were placed in." 2023 WL 3149243, at *29. "Individuals in regular removal proceedings
   enjoy far more robust due process protections because Congress has conferred additional statutory rights on them."
28 (*Id.*) (citing 8 U.S.C. §§ 1158(a)(1), (d)(4), 1229a(b)(4), 1362).

1    here for the retroactive application of their new interpretation to Petitioner (and many others like

2    her), even though the government previously, affirmatively placed her into Section 240

3    proceedings—a system that affords non-citizens much greater procedural protections than to

4    those placed in expedited removal. *See Mata Velasquez v. Kurzdorfer*, No. 25-CV-493-LJV,

5    2025 WL 1953796, at *9 (W.D.N.Y. July 16, 2025)("Because DHS chose to place Mata

6    Velasquez in section 240 proceedings instead of pursuing expedited removal in the first

7    instance—even though it was not required to do that—the government vested Mata Velasquez

8    with the rights that Congress guaranteed non-citizens in those proceedings."). M.M.R.'s situation

9    is not comparable to Valencia's, which may explain the lackluster due process arguments

10   presented in that case. *See Valencia*, 2025 WL 3205133, at *4.

11         Thus, because petitioner has been present in the United States for approximately two

12   years and was released on her own recognizance by ICE before Respondents adopted the new

13   interpretation of the governing statutes, the Court concludes that the government's recent

14   interpretation of the relationship between § 1225 and § 1226, even assuming it is correct—

15   though the Court is unconvinced that it is—does not apply here such that detention is not

16   "mandatory" in this case.

17         b.    *Due Process Protections*

18         Petitioner contends that her continued detention violates her due process rights.[5] (*See*

19   Doc. 2 at 12-17.) In *Pinchi v. Noem*, No. 5:25-CV-05632-PCP, ___ F. Supp. 3d ___, 2025 WL

20   2084921, at *3 (N.D. Cal. July 24, 2025), the court held,

21                **. . . even when ICE has the initial discretion to detain or release
22                a noncitizen pending removal proceedings, after that individual
                  is released from custody she has a protected liberty interest in
23                remaining out of custody.** *See Romero v. Kaiser*, No. 22-cv-02508,

---

24   [5] Respondents argue that Petitioner's due process rights have not been violated because she is subject to mandatory
     detention under § 1225(b). (Doc. 11 at 6.) For support, the government relies on a recent decision of the Board of
25   Immigration Appeals ("BIA"), *Matter of Yajure Hurtado*, 26 I&N Dec. 216 (BIA 2025). (Doc. 7 at 2-3.) In that
     case, the BIA held that noncitizens who are present in the United States without admission and are arrested on a
26   warrant are subject to section 1225(b)(2)(A). *Matter of Yajure Hurtado*, 29 I&N Dec. 216 (B.I.A. 2025). This Court
     is not bound by the BIA's interpretation of sections 1225 and 1226. A federal court "may look to [the BIA's]
27   interpretations [of the INA] for guidance, but [must not] defer to the agency. *Loper Bright Enters. v. Raimondo*, 603
     U.S. 369, 394, 413 (2024) (noting that constructions of statutes offered by the Executive Branch contemporaneous
28   with the passage of a law may be entitled to greater respect). For reasons discussed in greater detail below, the Court
     finds *Yujare Hurtado* to be inconsistent with the statutory language, and therefore unpersuasive.

2022 WL 1443250, at *2 (N.D. Cal. May 6, 2022) ("[T]his Court joins other courts of this district facing facts similar to the present case and finds Petitioner raised serious questions going to the merits of her claim that due process requires a hearing before an IJ prior to re-detention."); *Jorge M. F. v. Wilkinson*, No. 21-cv-01434, 2021 WL 783561, at *2 (N.D. Cal. Mar. 1, 2021); *Ortiz Vargas v. Jennings*, No. 20-cv-5785, 2020 WL 5074312, at *3 (N.D. Cal. Aug. 23, 2020); *Ortega*, 415 F. Supp. 3d at 969 ("Just as people on preparole, parole, and probation status have a liberty interest, so too does [a noncitizen released from immigration detention] have a liberty interest in remaining out of custody on bond.").

*Id.* (emphasis added). Other courts, including this Court, have held similarly. *Doe v. Becerra*, No. 2:25-CV-00647-DJC-DMC, 2025 WL 691664, at *4 (E.D. Cal. Mar. 3, 2025); *see also Padilla v. U.S. Immigr. & Customs Enf't*, 704 F. Supp. 3d 1163, 1172 (W.D. Wash. 2023) ("The Supreme Court has consistently held that non-punitive detention violates the Constitution unless it is strictly limited, and, typically, accompanied by a prompt individualized hearing before a neutral decisionmaker to ensure that the imprisonment serves the government's legitimate goals.").[6]

---

[6] Respondents rely on *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212 (1953) and its progeny for their argument that the Fifth Amendment does not apply to Petitioner. For example, they argue:

> An alien who has not effected a legal entry, i.e., has not been admitted into the United States, is entitled only to "[w]hatever the procedure authorized by Congress is." *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212 (1953) (quoting *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 544 (1950)); *see also Thuraissigiam*, 591 U.S. at 140 (an alien detained after unlawful entry "has only those rights regarding admission that Congress has provided by statute"); *Angov v. Lynch*, 788 F.3d 893, 898 (9th Cir. 2015) (for "those . . . who have never technically 'entered' the United States . . . procedural due process is simply whatever the procedure authorized by Congress happens to be" (cleaned up)). This makes sense, since "an alien seeking initial admission to the United States requests a privilege and has no constitutional rights regarding his application." *Barrera-Echavarria*, 44 F.3d at 1449. Put tersely, "applicants for admission have virtually no constitutional rights regarding their applications." *Valencia v. Mukasey*, 548 F.3d 1261, 1263 (9th Cir. 2008) (citing *Landon v. Plasencia*, 459 U.S. 21, 33-34 (1982)). "Whatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned." *Shaughnessy*, 338 U.S. at 544.

(Doc. 11 at 5.) However, as one thorough decision recently issued in the District of Arizona explained, *Thuraissigiam* is distinguishable:

> In *Thuraissigiam* the Supreme Court held that a petitioner who was stopped at the border did not have any due process rights regarding admission into the United States. *Thuraissigiam*, 591 U.S. at 107. In contrast, the pending § 2241 petition does not challenge any determination regarding [petitioner's] admissibility into the United States, but instead involves a challenge to her detention pending the conclusion of her removal proceedings.

*Rosado v. Figueroa*, No. CV 25-02157 PHX DLR (CDB), 2025 WL 2337099, at *15 (D. Ariz. Aug. 11, 2025), *report and recommendation adopted sub nom. Rocha Rosado v. Figueroa*, No. CV-25-02157-PHX-DLR (CDB), 2025 WL 2349133 (D. Ariz. Aug. 13, 2025).

1    Even assuming Respondents are correct that § 1225(b) is the applicable detention authority for

2    all "applicants for admission," Respondents fail to contend with the liberty interest created by

3    the fact that the Petitioner in this case was released on recognizance in December 2023, *prior to*

4    *the manifestation of this interpretation*.

5         Thus, the Court must evaluate the three-part test set forth in *Mathews v. Eldridge,* 424

6    U.S. 319, 334-335 (1976), to determine whether the procedures (or lack thereof) that have been

7    applied to Petitioner are sufficient to protect the liberty interest at issue. *Pinchi*, 2025 WL

8    2084921at *3.[7] In *Mathews*, the Court determined the following:

> [O]ur prior decisions indicate that identification of the specific
> dictates of due process generally requires consideration of three
> distinct factors: First, the private interest that will be affected by the
> official action; second, the risk of an erroneous deprivation of such
> interest through the procedures used, and the probable value, if any,
> of additional or substitute procedural safeguards; and finally, the
> Government's interest, including the function involved and the
> fiscal and administrative burdens that the additional or substitute
> procedural requirement would entail.

14        As to private interest, during her approximately two years on parole, Petitioner pursued

15   gainful employment, built relationships with many in her community, and kept a clean criminal

16   record. Thus, parole allowed her to build a life outside detention, albeit under the terms of that

17   parole. Petitioner has a substantial private interest in being out of custody and her detention

18   denies her that liberty interest. *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001) ("Freedom from

19   imprisonment—from government custody, detention, or other forms of physical restraint—lies at

20   the heart of the liberty that [the Due Process] Clause protects.").

21        The Court finds there is at least some risk of erroneous deprivation under the present

22   circumstances, with the record suggesting several reasons why Petitioner's detention may not be

23   justified. First, in 2023, in releasing her on parole, DHS necessarily concluded that Petitioner

24   was not a flight risk or danger to the community. *Noori v. LaRose, et al.*, 2025 WL 2800149, at

---

26   [7] Respondent argues (Doc. 11 at 7) that the Court should not apply *Mathews,* citing the Ninth Circuit's ruling in
     *Rodriguez Diaz*, 53 F.4th 1206, which noted that the Supreme Court, "when confronted with constitutional
27   challenges to immigration detention has not resolved the, through express application of Mathews." Yet, after noting
     that other circuits have applied the *Mathews* test to immigration detention issues and the Ninth Circuit has applied
28   *Mathews* in other immigration contexts, *Rodriguez Diaz* went on to "assume without deciding" that *Mathews*
     applied in the immigration context. *Id.* at 1207.

13* (S.D. Cal. Oct. 1, 2025) (In general, '[r]elease reflects a determination by the government

that the noncitizen is not a danger to the community or a flight risk.'" *Saravia v. Sessions,* 280 F.

Supp. 3d 1168, 1176 (N.D. Cal. 2017), aff'd sub nom. *Saravia for A.H. v. Sessions,* 905 F.3d

1137 (9th Cir. 2018)."

  This record also shows that Petitioner may have violated the terms of her release,

including missing both biometric check-ins and in-person meetings. (Doc. 10, ¶5.) Even still, the

remaining question is whether these missed biometric check-ins constitute changed

circumstances sufficient to convince an IJ that detention is required. The Supreme Court has held

that "the Constitution requires some kind of a hearing *before* the State deprives a person of

liberty or property." *See Zinermon v. Burch*, 494 U.S. 113, 127 (1990) (emphasis in original).

However, the Court also recognized that there may be situations that urgently require arrest, in

which a prompt post-deprivation hearing is appropriate. *Id.* at 128 (noting there may be "special

case[s]" where a pre-deprivation hearing is impracticable); *Guillermo M. R. v. Kaiser*, No. 25-

CV-05436-RFL, 2025 WL 1983677, at *9 (N.D. Cal. July 17, 2025) ("absent evidence of urgent

concerns, a *pre*-deprivation hearing is required to satisfy due process, particularly where an

individual has been released on bond by an IJ"). The rapidly developing caselaw on this subject

gives limited guidance as to where this line should be drawn. Some courts that have addressed

detention-related habeas petitions brought by persons released with enhanced supervision

conditions have required pre-deprivation process, but in somewhat different circumstances. In

*E.A.T.-B. v. Wamsley*, No. C25-1192-KKE, 2025 WL 2402130, at *4 (W.D. Wash. Aug. 19,

2025), the district court ordered the release of a petitioner arrested by ICE immediately after

appearing in immigration court. That court agreed with the petitioner that ICE's post hoc

explanation that violations warranted her detention was pretextual, given that ICE first became

aware of petitioner's alleged violations a few hours before her immigration hearing, DHS did not

raise those violations at the hearing or argue the petitioner should be detained for any reason, and

the petitioner was then provided multiple, inconsistent justifications for her arrest. *Id.* In *Arzate*

*v. Andrews*, No. 1:25-CV-00942-KES-SKO (HC), 2025 WL 2230521, at *7 (E.D. Cal. Aug. 4,

2025), converted to preliminary injunction sub nom, 2025 WL 2411010, at *1 (E.D. Cal. Aug.

20, 2025), the court ordered immediate release of in immigration detainee who had been in compliance with his conditions of release, even though he had incurred a misdemeanor arrest while on parole, in part because no charges were ever filed.

In contrast, this Court ordered a bond hearing in *Martinez Hernandez v. Andrews*, No. 1:25-CV-01035 JLT HBK, 2025 WL 2495767 (E.D. Cal. Aug. 28, 2025), where the petitioner's records indicated numerous violations. Though Martinez Hernandez offered explanations for the violations and there was a dispute of fact as to whether the violations occurred, ICE's reliance upon those violations was "not obviously pretextual." *Id*. at * 12 ("If Respondent's view of the facts is correct, it is at least arguable that providing Petitioner with notice and a pre-deprivation hearing would have been impracticable and/or would have motivated her flight."). As this Court noted in *Martinez Hernandez*:

> In similar circumstances, courts have refused to release the petitioners but have ordered timely bond hearings. *Carballo v. Andrews*, No. 1:25-CV-00978-KES-EPG (HC), 2025 WL 2381464, at *8 (E.D. Cal. Aug. 15, 2025), citing *Perera v. Jennings*, et. al, No. 21-CV-04136-BLF, 2021 WL 2400981, at *5 (N.D. Cal. June 11, 2021); *Pham v. Becerra*, No. 23-CV-01288-CRB, 2023 WL 2744397, at *6 (N.D. Cal. Mar. 31, 2023). "[A]llowing a neutral arbiter to review the facts would significantly reduce the risk of erroneous deprivation." *Guillermo M. R. v. Kaiser*, No. 25-CV-05436-RFL, 2025 WL 1983677, at *8 (N.D. Cal. July 17, 2025). Thus, the Court concludes that prompt, post-deprivation process is required here.

*Id*. Finally, as other courts have done, this Court concludes that the government's interest in detaining Petitioner without proper process is slight. In sum, the Court concludes thatShe has demonstrated a likelihood of success on the merits on her procedural due process claim.

### C.  Irreparable Harm

"It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 247, 272 (1976)). Moreover, "[t]he Ninth Circuit has recognized 'irreparable harms imposed on anyone subject to immigration detention' including 'the economic burdens imposed on detainees and their families as a result of detention.'" *Hernandez v. Sessions*, 872 F.3d 976, 995 (9th Cir. 2017); *Leiva-Perez v. Holder*, 640 F.3d 962, 969-970

1    (9th Cir. 2011) (the inability to pursue a petition for review may constitute irreparable harm).

2    The Petitioner has established irreparable harm.

3              **D.  Balance of the Harms/Public Interest**

4              Because the interest of the government is the interest of the public, the final two factors

5    merge when the government is the opposing party.  *Nken v. Holder*, 556 U.S. 418, 435 (2009).

6    The Court agrees with the analysis of *Pinchi,* and finds it correctly addresses the situation here:

> "[T]he public has a strong interest in upholding procedural protections against unlawful detention, and the Ninth Circuit has recognized that the costs to the public of immigration detention are staggering." *Jorge M. F.*, 2021 WL 783561, at *3 (cleaned up) (quoting *Ortiz Vargas*, 2020 WL 5074312, at *4, and then quoting *Hernandez*, 872 F.3d at 996); see also *Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005) ("Generally, public interest concerns are implicated when a constitutional right has been violated, because all citizens have a stake in upholding the Constitution."). Without the requested injunctive relief, Petitioner-Plaintiff faces the danger of significant health consequences and deprivation of her liberty. Yet the comparative harm potentially imposed on Respondents-Defendants is minimal—a mere short delay in detaining Petitioner-Plaintiff, should the government ultimately show that detention is intended and warranted. Moreover, a party "cannot reasonably assert that it is harmed in any legally cognizable sense by being enjoined from constitutional violations." *Zepeda v. U.S. Immigr. & Nat. Serv.*, 753 F.2d 719, 727 (9th Cir. 1983).
>
> This Court therefore joins a series of other district courts that have recently granted temporary restraining orders barring the government from detaining noncitizens who have been on longstanding release in their immigration proceedings, without first holding a pre-deprivation hearing before a neutral decisionmaker. *See, e.g., Diaz v. Kaiser*, No. 25-cv-05071, 2025 WL 1676854, at *2 (N.D. Cal. June 14, 2025); *Garcia v. Bondi*, No. 25-cv-05070, 2025 WL 1676855, at *3 (N.D. Cal. June 14, 2025). Although Petitioner filed her motion shortly after being detained, rather than immediately beforehand, the same reasoning applies to her situation. Her liberty interest is equally serious, the risk of erroneous deprivation is likewise high, and the government's interest in continuing to detain her without the required hearing is low. *See Doe v. Becerra*, No. 2:25-cv-00647-DJC-DMC, 2025 WL 691664, at *6 (E.D. Cal. Mar. 3, 2025) (granting a TRO as to an individual who had been detained over a month earlier).

*Pinchi*, at *3. In addition, there appears to be no dispute that there is no evidence that Petitioner

poses a risk of flight or a danger to the community. For these reasons and those set forth in

*Pinchi*, the Court concludes that the equities and public interest weigh in favor of Petitioner.

1

**E.  Bond**

2       "The court may issue a preliminary injunction or a temporary restraining order only if the

3   movant gives security in an amount that the court considers proper to pay the costs and damages

4   sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P.

5   65(c). The Court has "discretion as to the amount of security required, if any," and it "may

6   dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the

7   defendant from enjoining her or her conduct." *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th

8   Cir. 2003) (citation modified). Because "the [Government] cannot reasonably assert that it is

9   harmed in any legally cognizable sense by being enjoined from constitutional violations,"

10  *Zepeda*, 753 F.2d at 727, the Court finds that no security is required here.

11      **F.    Burden of Proof**

12      Petitioner requests that the Court order Petitioner released from custody and barred from

13  re-arrest in a subsequent action without a hearing before a neutral adjudicator. (*See* Doc. 2 at 29.)

14  In *Rodriguez Diaz v. Garland*, 53 F.4th 1189 (9th Cir. 2022), the Ninth Circuit considered

15  whether a noncitizen detained under § 1226(a) pending removal proceedings had a right to a

16  second bond hearing where the government would have the burden to establish by clear and

17  convincing evidence that her continued detention was justified. *Rodriguez Diaz* concluded that

18  due process did not require that procedure, reasoning in part that:

19
20
21
22
> Nothing in this record suggests that placing the burden of proof on
> the government was constitutionally necessary to minimize the risk
> of error, much less that such burden shifting would be
> constitutionally necessary in all, most, or many cases. There is no
> reason to believe that, as a general proposition, the government will
> invariably have more evidence than the alien on most issues bearing
> on alleged lack of future dangerousness or flight risk.

23
24  *Id*. at 1212. However, *Rodriguez Diaz* "held only that a noncitizen detained under section

25  1226(a) does not have a right to a second bond hearing when the only changed material

26  condition since their first bond hearing is the duration of their detention." *Pinchi*, 2025 WL

27  2084921, at *4. It did not address the burden of proof applicable under the present

28  circumstances.

20

1    *Pinchi* went on to discuss why the calculus changes for an individual who had been

2    paroled from immigration custody after their initial detention:

> Even assuming arguendo that the post-detention bond hearing provided under section 1226(a) provides constitutionally sufficient process for those noncitizens who have never previously been detained and released by DHS, [Petitioner's] circumstance is different. Her release from ICE custody after her initial apprehension reflected a determination by the government that she was neither a flight risk nor a danger to the community, and [she] has a strong interest in remaining at liberty unless she no longer meets those criteria. The regulations authorizing ICE to release a noncitizen from custody require that the noncitizen "demonstrate to the satisfaction of the officer that such release would not pose a danger to property or persons" and that the noncitizen is "likely to appear for any future proceeding." 8 C.F.R. § 1236.1(c)(8).
>
> Release [therefore] reflects a determination by the government that the noncitizen is not a danger to the community or a flight risk." *Saravia v. Sessions*, 280 F. Supp. 3d 1168, 1176 (N.D. Cal. 2017), aff'd sub nom. *Saravia for A.H. v. Sessions*, 905 F.3d 1137 (9th Cir. 2018). [Petitioner] was apprehended by ICE officers when she crossed the border into the United States [ ]. ICE then released her on her own recognizance. As ICE was not authorized to release [her] if she was a danger to the community or a flight risk, the Court must infer from [her] release that ICE determined she was neither. [Her] release from ICE custody constituted an "implied promise" that her liberty would not be revoked unless she "failed to live up to the conditions of her release." *Morrissey*, 408 U.S. at 482. The regulatory framework makes clear that those conditions were that she remain neither a danger to the community nor a flight risk. [She] justifiably relied on the government's implied promise in obtaining employment, taking on financial responsibility for her family members, and developing community relationships. The more than two years that she has spent out of custody since ICE initially released her have only heightened her liberty interest in remaining out of detention. Accordingly, [her] private interest in retaining her liberty is significant.

*Pinchi*, 2025 WL 2084921, at *4.

This reasoning contributed to the conclusion in *Pinchi* that a pre-deprivation hearing was

required under *Mathews*. The Court in *Pinchi* also placed the burden at any such hearing on the

government to demonstrate to a neutral decisionmaker by clear and convincing evidence that re-

detention is necessary to prevent danger to the community or flight. *Id.* at *7. Doing so is logical

even for a post-detention custody hearing for the reasons articulated in *Pinchi*–namely that the

immigrant's initial release reflected a determination by the government that the noncitizen is not

a danger to the community or a flight risk. Since it is the government that initiated re-detention, it follows that the government should be required to bear the burden of providing a justification for the re-detention.

**V.      CONCLUSION AND ORDER**

1.      Petitioner's Motion for Temporary Restraining Order (Doc. 2) is converted to a Motion for Preliminary Injunction, and it is **GRANTED in PART**.

2.      Petitioner **SHALL** be provided a *substantive* bond hearing **no later than December 5, 2025** at which the Immigration Judge will determine whether Petitioner poses a risk of flight or a danger to the community if she is released.

3.      At any such hearing, the Government **SHALL** bear the burden of establishing, by clear and convincing evidence, that Petitioner poses a danger to the community or a risk of flight, and Petitioner **SHALL** be allowed to have counsel present.

4.      The government may file a further brief on the merits of the habeas petition within 45 days. Alternatively, as soon as it can within that 30-day period, the government may file a notice that it does not intend to file further briefing. If the government files an additional brief, Petitioner may file a further brief within 30 days thereafter.

5.      The matter is referred to the assigned magistrate judge for consideration of the merits of the petition as quickly as possible.

6.      Respondents' Motion to Strike is **DENIED**.

IT IS SO ORDERED.

Dated:   **November 21, 2025**

UNITED STATES DISTRICT JUDGE